## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE PULLMAN GROUP, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>RUSSELL BAUKNIGHT, Personal Representative of the Estate of James Brown; JAMES BROWN ENTERPRISES, INC., and any successors and assigns; JAMES BROWN, L.L.C., and any successors and assigns; PRIMARY WAVE MUSIC PUBLISHING LLC; SHOT TOWER CAPITAL LLC; JOHN DOE CORPORATIONS 1–5,<br><br>    Defendants. | Case No.: 22-9713<br><br>**COMPLAINT** |

Plaintiff, The Pullman Group, LLC ("The Pullman Group"), through its undersigned attorneys, by and for its Complaint against Russell Bauknight, the Personal Representative of the Estate of James Brown; James Brown Enterprises, Inc., and any successors and assigns; James Brown, L.L.C., and any successors and assigns (collectively, "the Brown Defendants"); Primary Wave Music Publishing LLC; Shot Tower Capital LLC; and John Doe Corporations 1–5, hereby allege as follows:

### NATURE OF THE ACTION

1.      This action arises out The Pullman Group's contractual agreement (the "Exclusive Engagement Letter"), dated February 24, 1999, with the artist and songwriter James Brown and James Brown Enterprises, Inc. ("JBE"), and its successors and/or assigns. The Exclusive Engagement Letter provided The Pullman

Group with the exclusive rights to refinance or sell the assets of James Brown and JBE including valuable rights derived from music copyrights, royalties, and other music-related assets related to a large number of musical compositions and songs created and/or performed by James Brown. This complaint seeks damages arising out of Defendants' breach of and interference with The Pullman Group's exclusive contractual rights under the Exclusive Engagement Letter. A true and correct copy of the Exclusive Engagement Letter is attached hereto as **Exhibit A**.

2.      Brown, who died on December 25, 2006, was a popular and influential artist and songwriter who enjoyed vast commercial success during his career. Despite this success, he faced financial difficulties throughout his life because of his spending habits and legal problems, including federal income tax problems and liens.

3.      As explained herein, Brown and JBE executed the Exclusive Engagement Letter with The Pullman Group on February 24, 1999, to raise funds that Brown needed to organize his financial affairs.

4.      The Pullman Group buys, sells, and invests in assets and owns rights to thousands of songs and musical compositions. Its founder, David Pullman, is credited as the inventor and creator of the first ever asset-backed securitization of future royalties from music, entertainment, and intellectual property assets, known as "Pullman Bonds.™"[1] The first Pullman Bond deal created by David Pullman and The Pullman Group was a $55 million transaction for the late iconic musical artist and

---

[1] Pullman Bonds are a registered trademark of The Pullman Group LLC, and Bowie Bonds are an internationally registered trademark of The Pullman Group LLC.

songwriter David Bowie. The Pullman Bowie Bond was rated single-A level by multiple rating agencies and was a landmark transaction in financial history that garnered worldwide acclaim, including thousands of newspaper and magazine articles, podcasts, radio, and television news coverage segments, specials, and interviews. Pullman Bonds have been created by The Pullman Group and David Pullman for some of the most well-known and successful musical artists, including James Brown, the Motown Hit Machine, Holland-Dozier-Holland, R&B Royalty, Ashford & Simpson, and The Isley Brothers, among others. *See* https://www.pullmanbonds.com.

5.    Pullman Bonds are backed by an artist's and/or songwriter's expected future royalty income, and their proceeds benefit the artist/songwriter. The Pullman Group has arranged dozens of deals backed by artists' and/or songwriters' catalogues, providing financing of all types, including acquisition financing, engaging in asset sales in whole and/or in part, making direct purchases of such assets, and/or performing alternative investments and/or investment banking services.

6.    Pursuant to the Exclusive Engagement Letter, The Pullman Group securitized Brown's assets as part of a Pullman Bond offering. In return for giving up the rights to receive income from those assets during the recoupment period of the Pullman Bonds, Brown received an up-front payment of $26 million. As part of the compensation for The Pullman Group's services, the Exclusive Engagement Letter provided The Pullman Group with the exclusive rights, following recoupment of the

Pullman Bonds, to arrange any future refinancing or asset sale of Brown's assets until at least 2059.

7.      On or about December 13, 2021, the Brown Defendants, secretly and behind The Pullman Group's back, sold Brown's assets to Primary Wave Music Publishing LLC, a music publishing and talent management company, for $90 million (the "Primary Wave Transaction"). *See* Ben Sisario & Steve Knopper, *After 15 Years of Infighting, James Brown's Estate is Sold*, N.Y. Times (Dec. 13, 2021), attached hereto as **Exhibit B**. The Brown Defendants prevented The Pullman Group's involvement in the Primary Wave Transaction, and instead retained Shot Tower Capital LLC to arrange the Primary Wave Transaction. The Primary Wave Transaction violated The Pullman Group's exclusive rights under the Exclusive Engagement Letter to arrange such asset sales for Brown and his estate.

8.      Primary Wave and Shot Tower Capital had actual and constructive knowledge of The Pullman Group's exclusive rights under the Exclusive Engagement Letter because, in 2002, The Pullman Group had filed and recorded the Exclusive Engagement Letter with the United States Copyright Office to notify the world of The Pullman Group's exclusive rights. A true and correct copy of the Certificate of Recordation is attached hereto as **Exhibit C**.

9.      Because the Exclusive Engagement Letter provides that The Pullman Group has the exclusive rights to refinance any future transaction or asset sale(s) of James Brown's assets, the sale of those assets by the Brown Defendants to Primary Wave gives rise to claims against the Brown Defendants for breach of contract, and

claims against Primary Wave and Shot Tower Capital for tortious interference with contract, as herein pleaded.

10.     The Pullman Group brings this action to recover damages and other such appropriate relief from Defendants for their violation of The Pullman Group's rights under the Exclusive Engagement Letter, including damages of no less than 12.5% of the value of the Primary Wave Transaction against the Brown Defendants, representing The Pullman Group's contractual fee for a sale of such magnitude, as well as liquidated damages in the amount of $250,000, and contractual costs, legal fees, and interest from the date of Defendants' breach. The Pullman Group additionally seeks compensatory and punitive damages against Primary Wave and Shot Tower Capital for their malicious and intentional interference with The Pullman Group's exclusive contractual rights.

## PARTIES

11.     The Pullman Group, LLC is a Delaware limited liability company. The Pullman's Group Founder, Chairman, and CEO, and sole member David Pullman is a resident of California.

12.     Defendant Russell Bauknight is the Personal Representative of the Estate of James Brown, who died on December 25, 2006. Brown was a resident of South Carolina when he died. Bauknight, who has served as the estate's Personal Representative since 2009, is also a resident of South Carolina and is a partner at the South Carolina accounting firm of Bauknight, Pietras & Stormer, P.A.

13.    Defendant James Brown Enterprises, Inc. ("JBE") was a South Carolina corporation for the purpose of organizing and providing services for James Brown and the musicians that worked for him. Conveniently, Russell Bauknight filed Articles of Dissolution for JBE with the South Carolina Secretary of State on December 12, 2021, immediately after the Primary Wave Transaction.

14.    Defendant James Brown, L.L.C. was a Delaware limited liability company with its principal place of business in South Carolina. James Brown, L.L.C. was formed in May 1999 as a vehicle to own assets of James Brown including royalty income from Brown's songs, musical compositions, and assets. James Brown was the sole member of James Brown, L.L.C. A certificate of cancellation for James Brown, L.L.C. was filed with the Delaware Secretary of State on December 20, 2021.

15.    Bauknight, JBE, and James Brown, L.L.C., and their successors and assigns, referred to herein as the "Brown Defendants," collectively have been the owners of the assets sought to be conveyed in the Primary Wave Transaction.

16.    Defendant Primary Wave Music Publishing LLC, is a New York limited liability company with its principal place of business in New York, New York. Upon information and belief, Primary Wave's sole member is Lawrence Mestel, a resident of New York.

17.    Defendant Shot Tower Capital LLC is a Delaware limited liability company with its principal place of business in Baltimore, Maryland. Upon information and belief, Shot Tower Capital's members are David Dunn and Robert Law, residents of Maryland.

18.     The John Doe Defendants are entities or persons not presently known to The Pullman Group but who contracted with, for, or on behalf of the Brown Defendants with respect to the Primary Wave Transaction.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction based on diversity pursuant to 28 U.S.C. § 1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. As set forth more fully above, Plaintiff, by virtue of the citizenship of its sole member, is a citizen of California (because a limited liability company has the citizenship of its member(s)) and all Defendants are citizens of different states than Plaintiff. Thus, Plaintiff and Defendants are considered diverse under 28 U.S.C. § 1332(a)(1).

20.     Venue is proper in this judicial district because James Brown and JBE, and their successors and assigns, have consented to venue in this District in their Exclusive Engagement Letter with The Pullman Group.

21.     The Exclusive Engagement Letter provides as follows:

> In the event that any legal proceeding shall be instituted under or in connection with this Engagement Letter, the ***federal*** and state courts located in ***New York, New York***, shall have full jurisdiction over both parties with regard thereto, and litigation shall be commenced solely in said courts.

Exhibit A ¶ 12 (emphasis added).

22.     The Exclusive Engagement Letter provides that it shall be interpreted under and governed by the laws of the State of New York. *Id*.

23.     Venue is also appropriate under 28 U.S.C. § 1391 because Primary Wave

is headquartered in New York, New York.

## FACTUAL ALLEGATIONS

**A.    In 1999, Brown and JBE executed an Exclusive Engagement Letter with The Pullman Group to issue Pullman Bonds backed by Brown's assets in order to raise millions of dollars to help resolve Brown's financial liabilities including his federal tax debt.**

24.     Brown was a popular and influential musician, known as the "Godfather

of Soul," among other honors. Brown enjoyed vast commercial and financial success

and critical acclaim throughout his decades-long career.

25.     Despite this success, Brown faced financial difficulties due to his

exorbitant spending and myriad legal problems and liens, including a multi-million

dollar federal tax debt, which led the IRS to seize Brown's Beech Island, South

Carolina property in 1985.[2]

26.     As part of a plan to get Brown's financial affairs under control, Brown

and JBE approached The Pullman Group in 1999 to discuss obtaining a lump sum

up-front payment in exchange for future royalties as part of a Pullman Bond deal

with David Pullman and The Pullman Group, which led to The Pullman Group

securitizing Brown's assets.

27.     Two years earlier, David Pullman—the Founder, Chairman, and CEO

of The Pullman Group—had pioneered the first ever asset-backed securitization of

---

[2] *See* Bill Torpy, *James Brown's rocky road to wealth: Financial turmoil part of 'Godfather' legend*, Atlanta Journal-Constitution (Jan. 7, 2007), *available at* https://www.ajc.com/news/georgia-news/james-browns-rocky-road-to-wealth-financial-turmoil-part-of-godfather-legend/HYSLOH56XFCXNOX4FCQTJCAPPY/.

future royalties from music, entertainment, and intellectual property assets, known as "Pullman Bonds.™" The first Pullman Bonds were for the late iconic musical artist and songwriter David Bowie. The Pullman Bowie Bond was rated single-A level by multiple rating agencies and was a landmark transaction in financial history that garnered worldwide acclaim, including thousands of newspaper and magazine articles, podcasts, radio, and television news coverage, segments, specials, and interviews. *See* https://www.pullmanbonds.com.

28.     The Pullman Bonds achieved for David Bowie a lump sum payment of $55 million, part of which David Bowie used to buy out his former manager's minority ownership interest in Bowie's early record masters.

29.     Pullman Bonds have been created by The Pullman Group and David Pullman for some of the most well-known and successful musical artists, including James Brown, the Motown Hit Machine, Holland-Dozier-Holland, R&B Royalty, Ashford & Simpson, and The Isley Brothers, among others. *See* https://www.pullmanbonds.com.

30.     In 1999, The Pullman Group was essentially the only market option available for an artist and/or songwriter hoping to obtain financing by securitizing future royalties.

31.     Brown and JBE executed the Exclusive Engagement Letter with The Pullman Group on February 24, 1999, after which The Pullman Group securitized Brown's assets in Pullman Bonds. Brown and JBE had multiple attorneys and

professionals representing them at the time the Exclusive Engagement Letter was executed, including in South Carolina and New York.

32.     To reduce the up-front costs for Brown and JBE, The Pullman Group waived its retainer for securitizing Brown's assets into Pullman Bonds. The Pullman Group's compensation for the transaction was thus entirely "success-based." In other words, The Pullman Group would only receive its fees if the Pullman Bond transaction was completed successfully. In exchange for taking on the risk that the transaction would not be successful, The Pullman Group negotiated for and received valuable exclusive future rights under the Exclusive Engagement Letter, as further described below.

33.     By their nature, securitizing musical assets into a Pullman Bond offering is a complex and difficult undertaking. The James Brown Pullman Bond securitization was particularly complicated "because James Brown was complicated." *See* Exhibit B.

34.     Despite this complexity, the securitization was completed successfully, and The Pullman Group arranged a $26 million sale of Pullman Bonds for Brown and JBE in or about 1999.

35.     David Pullman and The Pullman Group thereafter enjoyed an excellent, successful, and mutually beneficial relationship with James Brown until Brown became ill and then incapacitated in the months before his death in 2006, when the people surrounding Brown did not allow anyone to communicate with or have contact with him.

**B.   The Exclusive Engagement Letter gave The Pullman Group the exclusive rights to arrange all future refinancing or asset sales of Brown's assets.**

36.   The Exclusive Engagement Letter provides The Pullman Group with exclusive rights regarding financial transactions related to James Brown's assets, including the right to arrange any future refinancing or asset sale(s).

37.   Specifically, paragraph 7 of the Exclusive Engagement Letter provides:

> 7.   <u>Refinancing or ***Asset Sale(s)***</u>.   Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or ***asset sale(s)*** for owner upon future recoupment of the securities. Such financing shall be at a minimum transaction size of seven times the average of the preceding three to five years cash flow or at the same size as the initial transaction contemplated by this agreement. Such refinancing will be on the same terms and conditions outlined herein. This clause shall be interpreted to include all future financings during the greater of owner's life or two future financing periods in addition to the initial financing contemplated by this agreement.

Exhibit A at ¶ 7 (emphasis added).

38.   As the contractual language makes clear, several conditions need to be satisfied in order for The Pullman Group's exclusive rights under paragraph 7 to apply. First, the original $26 million Pullman Bond securitization had to be recouped. Second, a new financing or asset sale needed to occur. Third, the new transaction needed to be at least the same "transaction size" as the original $26 million bond offering (or seven times the size of the preceding three- to five-years' cash flow). And fourth, the new transaction had to occur within a defined period—the greater of (1)

the life of James Brown and/or JBE, or (2) the initial financing period, plus two future financing periods.

39.     The initial financing period for James Brown's Pullman Bond securitization was 20 years, commencing in 1999. Thus, The Pullman Group's exclusive rights under paragraph 7 remain in effect at least through that initial 20-year period and two additional 20-year periods, or until 2059.

40.     Other provisions in the Exclusive Engagement Letter confirm The Pullman Group's exclusive rights thereunder. Exhibit A at 1 & ¶¶ 2, 4.

41.     The exclusive rights with respect to any future refinancing or asset sale(s) were an essential benefit for which The Pullman Group negotiated under the Exclusive Engagement Letter. As noted above, the Pullman Group agreed to waive its customary retainer fee in order to secure these exclusive rights. *See* Exhibit A ¶ 5(a)(i).

42.     The Pullman Group's compensation is set forth at ¶ 5(a) of the Exclusive Engagement Letter:

>  5. <u>Compensation to Pullman</u>
>
>  (a) As compensation for Pullman's performance of the Services, Owner shall pay to Pullman:
>
>  (i)     Pullman waives the retainer for this transaction.
>
>  (ii)    A fee equal to ***twelve and one half percent (12½%)*** of the ***aggregate principal amount*** of invest-grade Securities, payable at the time the Securities are ***sold***.

> (iii)   A fee equal to that fee standard and customary in the investment banking industry at the time of the closing for the Services provided by Pullman with respect to any equity or debt public offering, merger, acquisition, or other Transaction for which a fee is not stated in the preceding subparagraphs of this paragraph 5(a).

Exhibit A ¶ 5(a) (emphasis added).

43.    Furthermore, paragraph 5(c) of the Exclusive Engagement Letter provides, in relevant part, as follows:

> Owner acknowledges that Pullman should be entitled to its fee in full, pursuant to paragraph 5(a), in the event that: …

> (iii) A Transaction does not occur because of Owner's **failure or refusal** to perform its obligations under this Engagement Letter ….

Exhibit A ¶ 5(c) (emphasis added).

44.    The Exclusive Engagement Letter further provides that the losing party in any litigation thereunder "shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such legal proceeding." *Id.* ¶ 12.

45.    With respect to a future refinancing or asset sale(s) covered by paragraph 7, the Exclusive Engagement Letter requires that the new transaction will be "on the same terms and conditions" outlined in the Exclusive Engagement Letter, including the terms and conditions regarding compensation, attorney's fees, and costs. *See* Exhibit A ¶ 7.

46.     Shortly after The Pullman Group successfully completed its first transaction for James Brown, and in order to secure and perfect The Pullman Group's rights under the Exclusive Engagement Letter, The Pullman Group filed and recorded the Exclusive Engagement Letter with the United States Copyright Office, putting the world on constructive notice of The Pullman Group's rights under the Exclusive Engagement Letter. *See* Exhibit C.

47.     The Pullman Bonds issued for James Brown pursuant to the Exclusive Engagement Letter were 20-year bonds and were fully satisfied and paid off from James Brown's securitized music royalties cash flow prior to the Primary Wave Transaction.

**C.    Prior litigation between the parties confirmed The Pullman Group's exclusive rights under the Exclusive Engagement Letter.**

48.     In May 2006, The Pullman Group learned that notwithstanding the express exclusivity provisions of the Exclusive Engagement Letter, James Brown's representatives had secretly engaged the Royal Bank of Scotland to refinance the indebtedness created by the 1999 James Brown Pullman Bond securitization that The Pullman Group had structured.

49.     When it learned about the proposed transaction, The Pullman Group's attorney sent a letter to Brown and James Brown, L.L.C., asserting that the refinancing transaction violated The Pullman Group's exclusive contractual rights under paragraph 7 of the Exclusive Engagement Letter to refinance any future transaction(s) or asset sale(s).

50.     Brown, JBE, and James Brown, L.L.C. then sued The Pullman Group in New York state court seeking a declaratory judgment of the parties' rights under the Exclusive Engagement Letter and alleging tortious interference with prospective economic advantage. A copy of the Exclusive Engagement Letter was attached as the first exhibit to their complaint. *See Brown v. The Pullman Group, LLC*, No. 602593/2006, 2008 WL 1773932, at *2 (N.Y. Sup. Ct. Apr. 08, 2008). The Pullman Group counter-claimed for declaratory judgment and breach of contract. *See generally Brown v. The Pullman Group, LLC*, No. 602593/06 (Sup. Ct., N.Y. County).

51.     Brown died on December 25, 2006, shortly after the lawsuit was filed, and the transaction with the Royal Bank of Scotland was never consummated. The then-Personal Representative of James Brown's estate refused to close the transaction because doing so would have required that The Pullman Group be paid its full fees plus liquidated damages pursuant to the Exclusive Engagement Letter. All claims were eventually dismissed.

52.     In an August 20, 2007 decision issued in the case, the Supreme Court of New York County confirmed that, under paragraph 7 of the Exclusive Engagement Letter, "Pullman was granted the exclusive right to refinance any future transactions or assets sales for [James Brown and JBE] upon future recoupment" of the Pullman Bonds. *Brown v. The Pullman Group LLC*, No. 0602593/2006, 2007 WL 2815471 (Sup. Ct., N.Y. Cty. Aug. 20, 2007). The court further held that "the Exclusive Engagement Letter binds Brown, and he could not avoid his obligation by acting through another entity" such as James Brown, L.L.C.. *Id.*

53.     In a later decision issued in the case, the New York County Supreme Court found that paragraph 7 was not violated by the Royal Bank of Scotland negotiations because that transaction was never consummated. Indeed, JBE's sole reason for not consummating the transaction was to avoid paying The Pullman Group all its fees due under the Exclusive Engagement Letter. Rather than pay The Pullman Group, JBE and the then-Personal Representative of Brown's estate backtracked and did an about-face following The Pullman Group's contract counterclaim, and stated in their court filings that they wanted to abandon the transaction that they themselves had sued The Pullman Group in order to close, and that they had no intention of resurrecting the transaction at that point or at any time in the future. *See* Mem. in Support of Mot. to Dismiss 2, 4, *Brown v. The Pullman Group LLC*, No. 0602593/2006 (Sup. Ct., N.Y. Cty. Aug. 31, 2007). The then-Personal Representative repeated these assurances directly to The Pullman Group.

54.     The court found that if Brown and JBE *had* closed on the transaction "that would itself be a breach" of paragraph 7 of the Exclusive Engagement Letter. *Brown v. The Pullman Group LLC*, No. 0602593/2006, 2008 WL 1773932 (Sup. Ct., N.Y. Cty. Apr. 8, 2008). On The Pullman Group's appeal, the Appellate Division, First Department, likewise noted that The Pullman Group's exclusive rights under paragraph 7 of the Exclusive Engagement Letter "***unambiguous[ly]***" applies to "***consummated transactions, sales and financing***." *Estate of James Brown v. The Pullman Group LLC*, 60 A.D.3d 481, 482 (1st Dep't 2009) (emphasis added).

**D.     In violation of The Pullman Group's exclusive rights, the Brown Defendants go behind The Pullman Group's back and sell Brown's assets to Primary Wave for $90 million dollars.**

55.     On or about December 13, 2021, The Pullman Group learned for the first time when *The New York Times* broke the story that the Brown Defendants, secretly and behind The Pullman Group's back, had sold Brown's assets—"including music rights"—to Primary Wave, "a New York company that specializes in marketing estates and song catalogs" in a deal "estimated at about $90 million." (the "Primary Wave Transaction"). *See* Exhibit B.

56.     Under the deal, Primary Wave "is buying the assets of the Brown estate, including music rights, real estate and the control over Brown's name and likeness." *Id.* The Primary Wave Transaction is apparently a means of "financing" Brown's intended charitable giving, which had been prevented "by one of the most contentious estate conflicts in entertainment" including "numerous lawsuits in state and federal courts, costing millions of dollars in legal fees and leaving a convoluted public record." *Id.* One of those lawsuits, which remains ongoing, is a "longstanding legal fight between" Bauknight and the estate's former Personal Representative Adele Pope, in which "each have accused the other of trying to profit from the estate." *Id.*

57.     The Primary Wave Transaction was not the result of arms-length negotiations on the open market. To the contrary, the Primary Wave Transaction was the result of years of secret closed-doors negotiations between the Brown Defendants, Primary Wave, and Shot Tower Capital.

58.     According to Bauknight, the Primary Wave Transaction was "in the works for nearly four years." *Id.*

59.     Shot Tower Capital both "represented the Estate of James Brown in its sale to Primary Wave" and raised not one but two rounds of funding for Primary Wave. *See* Exhibit D.[3]

60.     As part of the Primary Wave Transaction, Bauknight secured a new position with Primary Wave to in essence go with the Brown assets in a package deal. "[O]nce the estate is closed, he will continue to work with Primary Wave as a member of a board handling some of Brown's assets." Exhibit B. According to Bauknight, his relationship with Primary Wave will be "more of a partnership moving forward." *Id.*

61.     Within days of the Primary Wave Transaction being announced, in an apparent attempt to avoid liability under the Exclusive Engagement Letter, Bauknight filed Articles of Dissolution with the South Carolina Secretary of State to dissolve JBE, and filed a certificate of cancellation with the Delaware Secretary of State to cancel James Brown, L.L.C.

62.     By entering into the Primary Wave Transaction, the Brown Defendants violated The Pullman Group's exclusive contractual rights under the Exclusive Engagement Letter to arrange any future refinancing or asset sale(s) of Brown's assets.

63.     By retaining Shot Tower Capital to arrange the Primary Wave Transaction, the Brown Defendants violated The Pullman Group's exclusive contractual rights under the Exclusive Engagement Letter to arrange any future refinancing or asset sale(s) of Brown's assets.

---

[3] **Exhibit D** is a true and correct copy of Shot Tower Capital's LinkedIn page.

64.     Primary Wave bought James Brown's assets subject to The Pullman Group's rights under the Exclusive Engagement Letter. Shot Tower Capital was also subject to The Pullman Group's exclusive rights under the Exclusive Engagement Letter regarding the Primary Wave Transaction.

65.     Because The Pullman Group had caused the Exclusive Engagement Letter to be recorded in the United States Copyright Office, Primary Wave and Shot Tower Capital had actual and constructive knowledge of The Pullman Group's rights under the Exclusive Engagement Letter. Additionally, the prior New York litigation between The Pullman Group and the Brown Defendants, and the various rulings and decisions therein, were all matters of public record and would have been revealed in due diligence for an asset sale acquisition approaching $100 million.

66.     By working for years in secret on the Primary Wave Transaction, Primary Wave and Shot Tower Capital intentionally and maliciously interfered with The Pullman Group's exclusive contractual rights under the Exclusive Engagement Letter to arrange any future refinancing or asset sale(s) of Brown's assets.

**E.    Under New York law, the Exclusive Engagement Letter is an exclusive sales agreement that prohibited the Brown Defendants from closing any refinancing or asset sale of the Brown's assets other than through The Pullman Group.**

67.     The Exclusive Engagement Letter grants The Pullman Group the "exclusive right" to "all future financings" within a defined period, including "asset sale[s]" like the Primary Wave Transaction. Exhibit A ¶ 7. Such future transactions

"will be on the same terms and conditions" outlined in the Exclusive Engagement Letter. *Id.* ¶ 7.

68.    Under well-settled New York law, the Exclusive Engagement Letter is an exclusive sales agreement, not merely an agency agreement. Under the former, the principal is liable to the broker if the principal makes a sale without involving the broker. Under the latter, the principal is precluded from employing another broker, but can make a sale himself without becoming liable to the broker for a commission. *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.,* 211 A.D.2d 262, 268 (1st Dep't 1995) ("It should be noted that an exclusive right to sell agreement entitles the broker to receive a commission on a sale to any purchaser, whether or not the broker played a part in the negotiations."); *Interactive Props. v. Doyle Dane Bernbach, Inc.*, 125 A.D.2d 265, 272–73 (1st Dep't 1986) ("It is well-accepted that a principal who makes a direct sale of property in violation of an exclusive right to sell certain property is liable to the broker for the agreed-upon commission, regardless of whether he [the broker] would have effected the sale."); *Hammond, Kennedy & Co. v. Servinational, Inc.*, 48 A.D.2d 394, 397 (1st Dep't 1975) ("If it was an exclusive agency, defendant could not employ another broker, but would not be precluded from itself making the sale without becoming liable to plaintiff for a commission. On the other hand, if the agreement was considered an exclusive right to sell, then plaintiff would be entitled to a commission even if the defendant alone was responsible for the sale."); *Barnet v. Cannizzaro*, 3 A.D.2d 745, 746 (2d Dep't 1957) (A brokerage agreement granting plaintiff "the 'sole and exclusive' right, for a period of 180 days, to sell the

property … was one of exclusive right of sale as contrasted to one of exclusive agency."); *Gaillard Realty Co. v. Rogers Wire Works, Inc.*, 215 A.D. 326, 332 (1st Dep't 1926) ("The general rule is that where an exclusive right of sale is given a broker, the principal cannot make a sale himself without becoming liable for the commissions." (citations omitted)); *see also Julien J. Studley, Inc. v. Coach, Inc.*, 3 A.D.3d 358, 359–60 (1st Dep't 2004) (holding that broker's claim for pre-termination breach of an exclusive agreement, which specified that all dealings would be handled through the broker for a specified period, had been erroneously dismissed where broker alleged that principal had excluded broker from negotiations).

69.    New York courts have not confined the distinction between exclusive sales and exclusive agency agreements to real property transactions, and have applied it in numerous commercial contexts, including the type of investment banking and related services presented in this case. *See, e.g.*, *CV Holdings, LLC v. Artisan Advisors, LLC*, 9 A.D.3d 654, 655–56 (3d Dep't 2004) (discussing whether a contract to provide "advisory and investment banking services with respect to the exploration of strategic alternatives that may lead to a possible … sale, merger, joint venture, or  otherwise" created an "exclusive right to sell" and required "a fee even when defendant [investment banking firm] played no active role in the transaction"); *Carnes Commc'ns, Inc. v. Russo*, 305 A.D.2d 332 (1st Dep't 2003) (analyzing nature of agreement pursuant to which plaintiff  "was to act as defendants' exclusive agent in placing advertising" and finding that contract "while affording plaintiff an exclusive agency, did not afford plaintiff an exclusive right to sell"); *Solid Waste Inst.*,

*Inc. v. Sanitary Disposal, Inc.*, 120 A.D.2d 915, 916–17 (3d Dep't 1986) (analyzing nature of a contract to arrange for sale of a business and holding that the contract at issue was an exclusive agency agreement and not an exclusive sales agreement, and that consequently broker who "played no role in procuring the buyer" was not entitled commissions).

70.     The Exclusive Engagement Letter is unambiguously an exclusive sales agreement as opposed to an exclusive agency agreement. It expressly provides The Pullman Group with "the exclusive right to sell" Brown's assets if several conditions are satisfied during the defined exclusivity period. *See Morpheus Cap. Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535 (2014); Exhibit A at ¶ 7 ("Pullman is granted the exclusive right, at its sole discretion, to refinance any future transaction(s) or asset sale(s) for owner upon future recoupment of the securities."). As set forth below, those conditions were all satisfied with respect to the Primary Wave Transaction. Because the Exclusive Engagement Letter was an exclusive sales agreement, The Pullman Group had the exclusive right to any future refinancing or asset sale(s), and as well by excluding The Pullman Group from the Primary Wave Transaction, each and every one of the Brown Defendants is liable for all of the fees and monies due under the Exclusive Engagement Letter.

71.     Moreover, under the law governing exclusive sales agreements, a "sale" as to which the broker has the exclusive rights need not finally "close" in order for the broker to be entitled to his full commission. Instead, the principal's unilateral agreement with a purchaser on the essential terms of a proposed sale, in violation of

the broker's exclusive rights, triggers the principal's liability. *See Barnet*, 3 A.D.2d at 746 ("[P]laintiff would be entitled to damages if [owner] and the purchaser actually agreed on the essential terms of the sale prior to October 14, 1952 [the end of the exclusivity period], despite the fact that the written contract of sale and the conveyance to the purchaser were not executed prior to that date."); *see also Mattingly v. Bohn*, 329 P.2d 1095, 10096 (Ariz. 1958) ("When an owner gives one agent the exclusive right to sell within a specified time, he in effect contracts he will not within such time make a sale through another agent and if such be done, the owner has breached his exclusive agency contract.  It is not always necessary to constitute a sale that a conveyance must be made or the title pass."); *Shanklin v. Townsend*, 431 S.W.2d 874, 876 (Ky. 1968) (holding that where an executed sales contract with a purchaser produced by the broker would have constituted a "sale" for purposes of entitling the broker to his commission, an executed sales contract with a purchaser produced by the seller, in violation of the broker's exclusive right of sale, "also must be regarded as a 'sale'").

## COUNT 1

### Breach of Contract against the Brown Defendants
### Violation of Paragraph 7 of the Exclusive Engagement Letter

72.     The Pullman Group incorporates by reference all of the allegations in the paragraphs above, as if fully set forth herein.

73.     The Exclusive Engagement Letter is a valid exclusive contract between The Pullman Group and Brown and JBE, and their successors and assigns including Bauknight, as Personal Representative of Brown's estate, and James Brown, L.L.C.

74. After agreeing to waive its customary retainer fee to reduce the up-front costs for James Brown and JBE, The Pullman Group fulfilled its obligations under the Exclusive Engagement Letter.

75. Pursuant to the Exclusive Engagement Letter, The Pullman Group arranged a $26 million sale of Pullman Bonds for James Brown and JBE in 1999. For these services, The Pullman Group received the 12.5% fee set forth in the Exclusive Engagement Letter, plus, among other things, the "exclusive right, at [its] sole discretion, to refinance any future transaction(s) or asset sales(s) for [Brown] upon future recoupment of the Securities … on the same terms and conditions outlined herein." Exhibit A ¶¶ 5, 7.

76. If the initial Pullman Bond transaction for Brown and JBE had not been completed successfully, The Pullman Group's exclusive rights under paragraph 7 would never have kicked in. Even after the transaction was completed and the bonds were fully recouped, The Pullman Group's rights under paragraph 7 would apply only in the event of a future refinancing or asset sale. Brown's estate and JBE had no obligation to ever enter into any future financing or asset sale and could instead have chosen to hold James Brown's assets and also continue to receive royalties and other income derived from James Brown's assets. Indeed, after completing the successful first transaction, The Pullman Group had to wait 22 years to be entitled to the benefit of the exclusive rights bargained for under paragraph 7.

77. The "Engagement Period" described in paragraph 2 of the Exclusive Engagement Letter does not limit The Pullman Group's "exclusive right, at its sole

discretion, to refinance any future transaction(s) or asset sale(s)" under paragraph 7 of the Exclusive Engagement Letter. *See* Exhibit A ¶¶ 2, 7. The "Engagement Period" in paragraph 2 only limits the time period that Period that The Pullman Group was to act as Brown's and JBE's "agent and advisor on an exclusive basis" with respect to the "Transactions," which the Exclusive Engagement Letter defines as "the financial transactions described in paragraphs 3(a) through (f)" of the Exclusive Engagement Letter. Exhibit A at 1. In other words, the Engagement Period only sets forth the time in which The Pullman Group was to complete the initial securitization and offering of the Pullman Bonds securities backed by Brown's assets.

78.     The Pullman Group's exclusive rights under paragraph 7 of the Exclusive Engagement Letter to "refinance any future transaction(s) or asset sale(s)" began upon "recoupment of the securities," applies to a transaction that is "a minimum transaction size … at the same size as the initial transaction contemplated by this agreement," and includes "all future financings during the greater of the owner's life or two future financing periods in addition to the initial financing contemplated by this agreement." Exhibit A ¶ 7.

79.     The securities issued pursuant to the Exclusive Engagement Letter in 1999 were 20-year bonds, and were fully satisfied and paid from the music royalties cash flow prior to the Primary Wave Transaction. Therefore, the "recoupment of the securities" contemplated by paragraph 7 of the Exclusive Engagement Letter occurred prior to the Primary Wave Transaction.

80.     The Primary Wave Transaction involved the sale of Brown's assets. It was therefore an "asset sale" and a "financing" under paragraph 7 of the Exclusive Engagement Letter.

81.     The Primary Wave Transaction was for $90 million. Therefore, it was at least the same "transaction size" as the original $26 million offering of the James Brown Pullman Bonds under paragraph 7 of the Exclusive Engagement Letter.

82.     The "initial financing" period contemplated by the Exclusive Engagement Letter was 20 years, beginning in 1999. Under paragraph 7, The Pullman Group's exclusive rights with respect to refinancing or asset sale(s) continued for the original 20-year period plus the greater of either (1) the life of any "Owner"—*i.e.*, Brown or JBE—under the Exclusive Engagement Letter; or (2) two additional 20-year "financing periods," or at least through 2059.

83.     One of the "terms and conditions" referenced in paragraph 7 of the Exclusive Engagement Letter is paragraph 5(c)(iii), which entitles The Pullman Group "to its fee in full," *i.e.*, 12½ percent plus interest, and liquidated damages in the amount of $250,000 in the event that a transaction "does not occur because of [Brown's and JBE's] ***failure or refusal*** to perform its obligations under this Engagement Letter." Paragraph 5(c) states, in relevant part:

> 5(c)     Owner acknowledges that ***Pullman shall be entitled to its fee in full***, pursuant to paragraph 5(a), in the event that:
>
> (i)  An investor from whom Owner accepts an offer to purchase the Securities requires Pullman to cease its marketing and sales efforts ***or Owner otherwise fails***

> **to permit Pullman to carry out its undertaking herein with regard to the transaction**.
>
> ***
>
> (iii)   **A Transaction does not occur because of Owner's failure or refusal to perform its obligations under this Engagement Letter, in which event**, since Owner acknowledges that Pullman will incur consequential damages by reason of the injury to its relations to third parties involved in the Transaction which are not susceptible to quantifiable proof, **Owner shall be additionally liable to Pullman for liquidated damages for such injury in the amount of $250,000**.

*See* Exhibit A ¶ 5(c) (emphasis added).

84.    The exclusive rights with respect to future refinancing or asset sale(s) were an essential benefit that The Pullman Group negotiated for and received under the Exclusive Engagement Letter. The Pullman Group would not have agreed to waive its customary retainer fee for a very complex, difficult, and success-based deal had The Pullman Group not received these exclusive rights.

85.    By entering into and excluding The Pullman Group from the Primary Wave Transaction, the Brown Defendants violated The Pullman Group's exclusive rights under paragraph 7 of the Exclusive Engagement Letter.

86.    Bauknight, as Personal Representative of Brown's estate, is liable for the breaches of JBE and James Brown, L.L.C. because Bauknight exercised complete domination and control of JBE and James Brown, L.L.C. during the Primary Wave Transaction, and used that domination and control to violate The Pullman Group's exclusive rights under the Exclusive Engagement Letter.

## COUNT 2

### Breach of Contract against the Brown Defendants
### Paragraph 7 of the Exclusive Engagement Letter - for Attorneys' Fees & Costs

87.     The Pullman Group incorporates by reference all of the allegations in the paragraphs above, as if fully set forth herein.

88.     Paragraph 12 of the Exclusive Engagement Letter provides that the losing party in any litigation involving the Exclusive Engagement Letter shall reimburse the prevailing party for its "reasonable attorney's fees and costs incurred with respect to such legal proceeding."

89.     Accordingly, Plaintiff is entitled to a judgment awarding attorneys fees' and costs for the breach of the Exclusive Engagement Letter by the Brown Defendants.

## COUNT 3

### Tortious Interference with Contract against
### Primary Wave and Shot Tower Capital

90.     The Pullman Group incorporates by reference all of the allegations in the paragraphs above, as if fully set forth herein.

91.     To state a tortious interference with contract claim under New York law, a plaintiff must allege (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.

*INV Accelerator, LLC v. MX Techs., Inc.*, 2020 WL 882902, at \*4 (S.D.N.Y. 2020) (citations omitted).

92.     The Exclusive Engagement Letter is a valid exclusive contract between The Pullman Group and Brown and JBE, and their successors and assigns including Bauknight, as the Personal Representative of Brown's estate, and James Brown, L.L.C..

93.     The Exclusive Engagement Letter grants The Pullman Group exclusive rights with regard to certain financial transactions, including the right to any future refinancing or asset sale(s).

94.     Primary Wave bought James Brown's assets subject to The Pullman Group's exclusive rights under the Exclusive Engagement Letter. Shot Tower Capital was also subject to The Pullman Group's exclusive rights under the Exclusive Engagement Letter regarding the Primary Wave Transaction.

95.     Because The Pullman Group had caused the Exclusive Engagement Letter to be recorded in the United States Copyright Office, Primary Wave and Shot Tower Capital had actual and constructive knowledge of The Pullman Group's rights under the Exclusive Engagement Letter. Additionally, the prior New York litigation between The Pullman Group and the Brown Defendants, and the various rulings and decisions therein were all matters of public record and would have been revealed in due diligence for an asset sale acquisition approaching $100 million.

96.     Primary Wave and Shot Tower Capital maliciously and intentionally induced the Brown Defendants and their corporate constituencies to breach their

contract with The Pullman Group and not to pay The Pullman Group the exclusive amount, fees, costs, attorneys' fees, interest due to The Pullman Group under the Exclusive Engagement Letter.

97.    Primary Wave and Shot Tower Capital worked for years, in secret, to improperly induce the Brown Defendants to breach the Exclusive Engagement Letter. *See* Exhibits C, D.

98.    Primary Wave and Shot Tower Capital had and have no lawful justification for their tortious interference with the exclusive Exclusive Engagement Letter.

99.    Primary Wave and Shot Tower Capital intended to damage The Pullman Group's exclusive contractual rights arising under the Engagement Agreement. *See, e.g.*, *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426–27 (2007) ("When the defendant is simply a competitor of the plaintiff seeking prospective customers and plaintiff has a customer under contract for a definite period, defendant's interest is not equal to that of plaintiff and would not justify defendant's inducing the customer to breach the existing contract."); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.,* 87 N.Y.2d 614, 621 (1996) ("[T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior.").

100.    The Pullman Group has suffered and will continue to suffer damages due to Primary Wave's and Shot Tower Capital's tortious interference with the Exclusive Engagement Letter.

101.    Because Primary Wave and Shot Tower Capital maliciously and intentionally interfered with The Pullman Group's exclusive contractual rights under the Exclusive Engagement Letter, Primary Wave and Shot Tower Capital are liable for punitive damages.

## COUNT 4

### Alternative Breach of Contract against the Brown Defendants Violations of Paragraph 7 of the Exclusive Engagement Letter

102.    The Pullman Group incorporates by reference all of the allegations in the paragraphs above, as if fully set forth herein.

103.    The Exclusive Engagement Letter is a valid, binding, and enforceable exclusive contract between The Pullman Group and Brown and JBE, and their successors and assigns including Bauknight, as Personal Representative of Brown's estate, and James Brown, L.L.C.

104.    By entering into and excluding The Pullman Group from the Primary Wave Transaction, the Brown Defendants violated The Pullman Group's exclusive rights under paragraph 7 of the Exclusive Engagement Letter.

105.    Alternatively, to the extent that the Brown Defendants argue that the Exclusive Engagement Letter constitutes an exclusive agency agreement, The Pullman Group is still entitled to its full fee, liquidated damages, interest, attorney's fees, and all other monies due under the Exclusive Engagement Letter.

106.    Under an exclusive agency agreement, an owner may independently sell the property to a buyer, but if the property is sold through another broker, "a commission is due to the broker who was given the exclusive agency." *Century 21 A.L.P. Realty v. Doller*, 170 A.D.2d 941 (3d Dep't 1991); *see also Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535 (2014).

107.    The Brown Defendants breached The Pullman Group's exclusive agency rights under paragraph 7 of the Exclusive Engagement Letter because they did not independently arrange the Primary Wave Transaction or the sale of Brown's assets but instead used another agent, Shot Tower Capital.

108.    Bauknight, as Personal Representative of Brown's estate, is liable for the breaches of JBE and James Brown, L.L.C. because Bauknight exercised complete domination and control of JBE and James Brown, L.L.C. during the Primary Wave Transaction, and used that domination and control to violate The Pullman Group's exclusive rights under the Exclusive Engagement Letter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that a judgment be entered:

(a) awarding contract damages against each and every one of Russell Bauknight, Personal Representative of the Estate of James Brown; James Brown Enterprises, Inc.; and James Brown L.L.C. in the amount of no less than $11,250,000, plus interest at the rate of 9% from the time of the breach, and liquidated damages in the amount of $250,000;

(b) awarding compensatory and punitive damages against Primary Wave Music Publishing L.L.C. in the amount of no less than $125,000,000;

(c) awarding compensatory and punitive damages against Shot Tower Capital L.L.C. in the amount of no less than $125,000,000;

(d) awarding attorneys' fees, costs, prejudgment interest at the rate of 9%, and expenses; and

(e) granting any other such relief as this Court deems just and proper.


## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:      November 15, 2022
            New York, NY

                              POLLOCK COHEN LLP

                              By:   */s/ Benjamin D. Battles*
                                    Adam Pollock
                                    Benjamin D. Battles

                              111 Broadway, Suite 1804
                              New York, NY 10006
                              Adam@PollockCohen.com
                              Tel: (212) 337-5361